IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RAYMOND K. HEDGESPETH, JR.,

                Plaintiff,                                OPINION and ORDER

    v.                                                         09-cv-246-slc

BYRON BARTOW,
    Director Wisconsin Resource Center, and
STEVE WATTERS,
    Director Sand Ridge Secure Treatment Center,

                Defendants.

---

Pursuant to Wis. Stat. Chapter 980, the State of Wisconsin has deemed plaintiff Raymond Hedgespeth, Jr., a sexually violent person and has committed him involuntarily for treatment at Sand Ridge Secure Treatment Center. Hedgespeth has filed this lawsuit seeking monetary, declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, claiming that defendants Byron Bartow and Steven Watters have violated his First Amendment rights by denying him the ability to purchase a computer, electronic media storage devices, CDs, DVDs, video games and video game equipment as well as restricting his access to movies and the internet. Now before the court is defendants' motion for summary judgment, dkt. 57.

I conclude that institution policies prohibiting Chapter 980 patients from possessing personal computers, digital media converters, internet access, video gaming equipment and unrestricted access to CDs and DVDs are reasonably related to legitimate institutional interests and do not violate Hedgespeth's rights under the First Amendment. Therefore, I am granting defendants' motion for summary judgment pursuant to F.R. Civ. P. 56(c) (summary judgment appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.")

As a preliminary matter, I note that the court granted Hedgespeth leave to proceed only on his claim that defendants violated the First Amendment by restricting Hedgespeth's ability to purchase electronic media and watch movies, and Judge Crabb instructed Hedgespeth that his claim fell under the standard set forth in *Turner v. Safely*, 482 U.S. 78 (1987), dkt. 10. Even so, in opposing defendants' summary judgment motion, Hedgespeth has argued at length about whether it is constitutional for Hedgespeth to be committed as a sexually violent person, whether the state has sufficient proof to keep Hedgespeth committed, whether his commitment hearing was impartial, whether civilly committed patients would be better off at Mendota Mental Health Institute than the Wisconsin Resource Center, whether the statistics and stereotypes related to sex offenders are accurate and whether he is receiving individualized treatment at Sand Ridge or Wisconsin Resource Center. Hedgespeth cites to and quotes from numerous cases without connecting them to the First Amendment issue in this lawsuit. Finally, Hedgespeth insists that his claim is governed by the due process clause and the rule in *Mathews v. Eldridge*, 424 U.S. 319 (1976). All of this is irrelevant to the lawsuit that this court has allowed to proceed.

If Hedgespeth believed that the court misunderstood his complaint and granted him leave to proceed on a legal theory that he was not actually pursuing, or that the court failed to grant leave on other valid claims, then it was Hedgespeth's obligation promptly to move for reconsideration so that the court could timely address his concerns. Hedgespeth did not file such a motion. Therefore, this lawsuit includes only his First Amendment claim related to computers, the internet, CDs, DVDs, video games and gaming systems. As a result, I have disregarded all proposed facts and legal arguments unrelated to this claim.

Also, on July 14, 2010, Hedgespeth filed a motion to submit further evidence (dkt. 79) which I will deny. The court's procedure governing summary judgment does not provide for such a submission and Hedgespeth has not adequately explained why he waited so long to submit this evidence. Although the court had not yet ruled on defendants' summary judgment motion, this did not give Hedgespeth license to continue to submit evidence and arguments until a ruling was entered.

From defendants' proposed findings of fact and Hedgespeth's responses, I find the following facts to be material and undisputed:

UNDISPUTED FACTS

**I. The Parties**

On May 11, 2001, Plaintiff Raymond Hedgespeth was committed as a sexually violent person under chapter 980 of the Wisconsin Statutes. Chapter 980 defines a sexually violent person as one "who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." Wis. Stat. 980.01(7). Chapter 980 patients are confined at both the Wisconsin Resource Center (WRC) and Sand Ridge Secure Treatment Center (Sand Ridge). Defendant Byron Bartow is the director of the Wisconsin Resource Center. Defendant Steve Watters is the former director of Sand Ridge and no longer is employed by the Wisconsin Department of Health Services.

Hedgespeth resided at WRC from April 12, 2000 to September 10, 2001; from February 8, 2007 to January 10, 2008; and from August 26, 2008 to July 30, 2009. He resided at Sand

Ridge from September 10, 2001 to February 8, 2007; from January 10, 2008 to August 26, 2008, and from July 30, 2009 to the present.

**II. Confinement and Treatment for Chapter 980 Patients**

The WRC is administered by the Department of Health Services in partnership with the Wisconsin Department of Corrections, and is a specialized mental health facility established as a prison under Wisconsin Statutes and as a secure treatment facility for the placement of sexually violent persons detained or committed under Chapter 980. Sand Ridge is a secure treatment facility administered by the Wisconsin Department of Health Services and houses only patients detained and committed under Chapter 980.

Chapter 980 patients confined at Sand Ridge and WRC have opportunities to pursue adult basic education or high school equivalency classes, participate in work programs, engage in recreational activities and hobbies, participate in religious worship and attend religious services. WRC and Sand Ridge have on-duty chaplains at the facilities to assist patients with religious groups and services or speak to patients in the event of a personal crisis. Patients at either facility have access to library services, including books, reference magazines and newspapers. Legal materials unavailable in the Sand Ridge library may be ordered through the reference and loan system. Patients are permitted to see visitors each day, send and to receive sealed mail. They have the right to communicate with family and friends by telephone. In the early days of Chapter 980, telephone access was not regulated carefully and many civilly committed patients contacted people in the community for criminal or deviant purposes. As a result, telephone access now is regulated.

WRC and Sand Ridge provide therapeutic and psychological services, individual counseling and crisis intervention for all chapter 980 patients. In addition, both Sand Ridge and WRC administer the Sexually Violent Persons Treatment Program (SVPTP), an inpatient program based on treatment methods dealing with sexually violent persons. The goal of the SVPTP is to return patients to the community with reduced risk of sexual violence and sexual recidivism. The treatment regimen most likely to rehabilitate a sexually violent person is an individually-tailored approach that includes careful assessment and employs a broad mix of cognitive-behavioral techniques. The success of the SVPTP depends on a safe, secure and therapeutic environment. On July 26, 2002, Hedgespeth consented to participate in the SVPTP.

### III.  Computer Policy

At some point in the past, WRC allowed patients to possess personal computers. WRC changed its policy because some patients used computers to engage in fraud, extortion and other criminal activities. On one occasion, patients used computers to reproduce gang-related materials, causing a facility-wide security risk at WRC that interfered with treatment. Patients also used computers in attempts to create official state documents, including release paperwork, to create pornography, and to extort other patients; they also possessed contraband hardware and engaged in unauthorized property transfers. Patients have developed fraudulent business practices and defrauded businesses through telephone calls and written letters. Now, patients at Sand Ridge and WRC are not allowed to own personal computers. Patients have access to computers on housing units in order to complete treatment assignments. These computers are monitored to insure that they are not used for fraudulent or counter-therapeutic activities.

5

The treatment directors for the SVPTP at WRC and Sand Ridge have concluded that patients should not have access to the internet or the ability to purchase personal computers or electronic media storage devices, because such access is not conducive to a therapeutic setting for sexually violent persons.  The Associate Treatment Director at Sand Ridge who is responsible for implementing the SVPTP has these particular concerns:

- Patients may use computers, the internet and digital storage devices for counter-therapeutic activities, such as writing pornographic stories, sharing pictures and stories with other patients or collecting large amounts of materials that can be readily transferred to other patients and hidden from treatment providers.

- Patients may use the internet to contact their victims or potential victims via instant messaging, chat rooms or email.

- For many people, time spent on the internet is difficult to self-regulate.  Many committed sex offenders have self-regulation problems and become consumed in dysfunctional activities at the expense of more productive activities.  Thus, for some patients, internet access could create distraction from productive activities, causing interfering with treatment involvement and progress.

- At other institutions that house sexually violent persons and allowed those patients access to the internet, staff has discovered patients viewing child pornography and distributing such material to others through the internet.

In addition to treatment and rehabilitation concerns, WRC and Sand Ridge have identified several security and managerial concerns related to patient access to personal computers, media storage devices and the internet.   Security officials at WRC and Sand Ridge are concerned that allowing patients to possess personal computers and other electronic media would cause these managerial and security problems:

- The staff at WRC and Sand Ridge do not have the expertise to perform effective searches of all patient computers in order to detect inappropriate or criminal content.  Thus, the institutions would have to hire and train more staff to perform this function.

6

- It would also require additional security staff time to make arrangements for personal computer maintenance, such as for service technicians to perform maintenance on personal computers or to package and ship computers to repair facilities.

- Small, portable storage devices that are used for data storage would create security concerns due to the ease in which small devices could be smuggled into the institution and then shared among inmates.

- Patients may access personal information of staff and their families and use that information to coerce or influence staff members.

- Allowing some patients to possess a coveted possession such as a personal computer with internet access may create discord and an environment ripe for illegal activities such as coercion, bribery and intimidation.

**IV. Movies**

Chapter 980 patients are not allowed unrestricted access to movies. Instead, staff maintains a list of pre-reviewed, approved movies. This list is reviewed on a quarterly basis. The list of approved videos contains over 3,000 movies which patients may own. Patients are allowed to possess as personal property at one time a combined total of 50 VHS tapes, CDs, cassette tapes or DVDs.

Sand Ridge and WRC staff also maintain a list of banned movies. The list of banned videos changes almost daily and currently includes about 1,170 titles. Movies are banned when treatment specialists review them and deem them to be counter-therapeutic for chapter 980 patients. Many civilly committed sex offenders have cognitive distortions and sexual deviance, so movies that can trigger and reinforce such distortions and deviance are banned. Examples of movies that are prohibited from treatment facilities for reasons pertaining to cognitive distortions include movies depicting violence as a normal way of life or the preferred, easy or only solution to problems; movies that sensationalize or support illegal activities and drug use;

and movies that are primarily intended for an audience of children. Movies that are prohibited for reasons pertaining to sexual deviance include those that depict nudity of children or adolescents, violent or degrading sex or abduction, torture or stalking, non-consensual sex and elements that feed offense-related sexual fantasies. While many non-offending adults can view these materials without ill effects, sexually violent persons have mismanaged their sexual behaviors such that they are much more susceptible to being harmed by viewing such materials and much more likely to use depictions to reinforce their offense-supportive beliefs and deviant sexual fantasies and behaviors.

In addition to reviewing movies initially for treatment concerns, staff members at Sand Ridge and WRC monitor and screen movies for security concerns. Movies and music that promote criminal activities, gang-related lifestyle and hate crimes against persons based on factors such as race, creed or sexual orientation may be banned. CDs are reviewed for alterations: on several occasions, patients have received altered movies that have been recorded over or contain unauthorized alternations, usually having pornography added to the movies.

**V.  Video Games and Game Systems**

The treatment staff believes it is therapeutically important for patients to develop leisure activities that are appropriate and beneficial to patients in terms of self accomplishment, constructive use of their spare time and to promote skills for a healthy leisure lifestyle. Some leisure activities that Sand Ridge has available for patients include leather work, bead work, models, weaving, drafting, painting and drawing.

Prior to July 2005, patients were allowed to possess approved video game equipment in their rooms for personal, recreational use. At that time, the security director reviewed requests for new video game equipment not on the approved property list. Additionally, before a patient could buy a new video game, he had to obtain institution approval to insure that the game was not counter-therapeutic or a security threat.

This changed in July 2005, when Sand Ridge treatment and security staff decided that patients no longer would be allowed to purchase new video game equipment or new video games. Staff agreed that chapter 980 patients could keep any previously approved video games and equipment that they had purchased prior to this change in policy. One of the reasons why Sand Ridge instituted this ban was that the video games were (and are) a tool that many sexual offenders have used to groom victims. Video game stores and arcades are places where contacts with potential victims can occur, which is also why sex offenders who are released into the community are not permitted to have video games. Another reason why new video games and video game systems are prohibited is that the content of some video games may send messages to the users about violence, fraud, sex, women and children. The video gaming rating system does not account for these considerations, and some games allow the user to progress through myriad levels that would be very difficult, if not impossible, for staff to access and review.

Some Chapter 980 patients have used video games to the extent of an obsession or addiction, and some patients were not able to remain awake and alert during treatment because they were overusing their video games. Further, the consistent use of video games fosters self-isolation rather than community involvement with the facility. Sand Ridge attempted to modify its policy regarding room visiting in an attempt to make video games a social, rather than

9

isolating activity, but staff found that this led some patients to lure vulnerable patients to their rooms to play video games in exchange for sexual favors.

Finally, there are security concerns regarding the possession of video games and game equipment, including the unauthorized borrowing and lending of games and game systems, the ability of certain patients to bribe or coerce other patients to play their game system and the inability of security staff to thoroughly search game systems. The current ban on patients purchasing new games or new game systems has helped to minimize these security concerns.

OPINION

Hedgespeth was granted leave to proceed on his claim that defendants Byron Bartow and Steven Watters violated his rights under the First Amendment by denying him the ability to purchase a computer, electronic media storage devices, CDs, DVDs, video games and video game equipment as well as restricting his access movies and the internet. Judge Crabb concluded that this claim is governed by the standard in *Turner v. Safely*, 482 U.S. 78 (1987), which sets out the standard for challenges to regulations that restrict a prisoner's fundamental constitutional rights. *See also Bridges v. Gilbert*, 557 F.3d 541, 547-48 (7th Cir. 2009) (applying *Turner* to prisoner First Amendment retaliation claim); *George v. Smith*, 507 F.3d 605, 608 (7th Cir. 2007) (recognizing that prison's decision to deny plaintiff books is governed by *Turner* standard). I agree that the *Turner* standard applies to Hedgespeth's claim. Although the courts have not defined the contours of a civilly detained person's right to free speech, Hedgespeth's rights are at least co-extensive with the rights of prisoners with respect to institutional regulations that curtail First Amendment rights. *E.g., City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)

("[T]he due process rights of a [pretrial detainee or other persons in state custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner."); *see also Stewart v. Timberlake*, 09-cv-687-bbc, dkt. 7, (W.D. Wis. Jan. 26, 2010) (applying *Turner* to chapter 980 patient's First Amendment claim for video games); *Amble v. Watters*, 2007 WL 5674493, *2-3 (W.D. Wis. Aug. 3, 2007) (analyzing chapter 980 patient's First Amendment claim for visitation rights under *Turner*); *Tran v. Kriz*, 2008 WL 794546, *3 (E.D. Wis. Mar. 21, 2008) (applying *Turner* to chapter 980 patient's claim for magazines and catalogs); *Riley v. Doyle*, 2006 WL 2947453, *4 (W.D. Wis. Oct. 16, 2006) (applying *Turner* to plaintiff's free speech claim).

Hedgespeth argues that *Turner* should not apply because he is not a prisoner whose constitutional rights are subject to restrictions. The Supreme Court and the Court of Appeals for the Seventh Circuit have rejected this argument. *E.g.*, *Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979) ("A detainee simply does not possess the full range of freedoms of an unincarcerated individual" because "[t]he fact of confinement as well as the legitimate goals and policies" of the institution limit constitutional rights.); *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2002) (persons confined as sexually violent "may be subjected to the ordinary conditions of confinement"); *see also Seibert v. Alt*, 31 Fed. Appx. 309, 311 (7th Cir. 2002) (unpublished) (institution may restrict rights of sexually violent person in order to maintain security and preserve internal order).

In the prison setting, regulations that restrict a prisoner's access to use and own electronic, educational and entertainment materials are "valid [if they] are reasonably related to legitimate penological interests." *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (citing *Turner*, 482 U.S. at 89). Applying the *Turner* rule to an institutional setting such as Sand Ridge or

WRC, institution regulations that restrict a patient's First Amendment rights are valid if they are reasonably related to a legitimate institutional interests, such as maintaining security, preserving internal order and rehabilitation. *McKune v. Lile*, 536 U.S. 24, 36 (2002) ("[R]ehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty."); *Turner*, 482 U.S. at 91 (rehabilitation and maintaining security are legitimate penological interests); *Allison*, 332 F.3d at 1079 (preventing escape and assuring safety of others are legitimate institutional interests); *Hendrickson v. Nelson*, 2006 WL 2334838, *3 (E.D. Wis. Aug. 10, 2006).

The Supreme Court set out four factors to be used in determining the reasonableness of prison regulations: (1) the existence of a "valid, rational connection" between the regulation and a legitimate, neutral government interest; (2) the existence of alternative methods for the inmate to exercise his constitutional right; (3) the effect the inmate's assertion of that right will have on the operation of the prison; and (4) the absence of an obvious, easy alternative method to satisfy the government's legitimate interest. *Turner*, 482 U.S. at 89-91.

In this case, defendants contend that the first *Turner* factor is satisfied because the WRC and Sand Ridge regulations prohibiting personal computers, digital media converters, internet access, new purchases of video gaming equipment and CD and DVD restrictions are reasonably related to several legitimate institutional interests, including security and rehabilitation. I agree. WRC and Sand Ridge have a legitimate interest in maintaining security of the institutions by preventing patients from improperly using computers to engage in fraud, extortion and other criminal activity and preventing discord that could occur between patients owning computers with those who do not. *Semler v. Ludeman*, 2010 WL 145275, *9-16 (D. Minn. Jan. 8, 2010)

(institution rules governing media, mail, personal property, telephone access and association between patients confined as sexually violent persons are valid under *Turner* because they are reasonably related to legitimate security and rehabilitative interests ); *Spicer v. Richards*, 2008 WL 3540182, *7-8 (W.D. Wash. Aug. 11, 2008) (state facility for civil detainee's "ban on the possession of electronic devices is reasonably related to the security and safety risks posed to [its] residents, staff, visitors, and the public," and therefore not violative of civil detainee's constitutional rights).  In addition, WRC and Sand Ridge have an interest in promoting rehabilitation and a therapeutic environment by preventing patients from accessing pornography, contacting their victims, viewing movies that may reinforce cognitive distortions or sexual deviance and playing video games that may encourage anti-social or obsessive behavior.

     Hedgespeth does not dispute that WRC and Sand Ridge have a legitimate interest in security and rehabilitation or that the restrictions at issue promote the interest.  Instead, Hedgespeth contends that *he* is not a security threat and electronics and media will not effect *his* individual rehabilitation; therefore, the restrictions should not apply to *him*.  However, defendants have a legitimate security interest in making uniform rules regarding property ownership and media restrictions to prevent discord, extortion and unauthorized property exchanges among patients.  *Allison*, 332 F.3d at 1079 (security is legitimate institutional interest).  Moreover, defendants have a legitimate rehabilitative interest in keeping potential damaging materials out of the institution altogether.

     With respect to the second *Turner* factor, defendants contend that patients, including Hedgespeth, have alternative means to pursue those areas Hedgespeth contends are impeded by WRC and Sand Ridge policies.  A patient may pursue his education, communicate with friends

and family, enjoy arts and sciences, practice his religion and work by various means: institution programs, telephonic and written correspondence, visiting the institution's library, participating in adult education classes, watching approved movies and engaging in other recreational activities offered by the institution. Hedgespeth does not dispute that these opportunities are available to him.

The third *Turner* factor asks whether lifting the restrictions on Hedgespeth would have an adverse effect on the operation of WRC and Sand Ridge. This factor weighs heavily in favor of upholding the electronic and media restrictions. As defendants point out in their brief, allowing patients to own personal computers, to access the internet and to own digital storage devices would be a security, treatment and administrative nightmare. Security staff would need to screen each patient's computer and digital storage devices for unauthorized content regularly and frequently; *daily* screening might well prove insufficient. Even then because it is relatively easy to hide and transfer digital files, some patients likely would succeed in caching and accessing unlawful or counter-therapeutic data. It borders on certainty that unrestricted access to the internet, movies and video games at WRC and Sand Ridge would interfere with the efforts to treat the patients.

The final *Turner* factors asks whether defendants have an obvious, easy alternative method to accomplish the government's legitimate interest. Hedgespeth offers several suggestions for how WRC and Sand Ridge staff could apply less restrictive computer, movie and video gaming policies. First, Hedgespeth suggests that Sand Ridge and WRC staff use the national rating systems for movies and video games, rather than apply their own "arbitrary" screening policies. However, Hedgespeth provides no factual basis for his assertions that the

national ratings system would provide adequate screening; he does not respond to defendants' assertion that national rating systems are not designed to screen movies for sexually violent persons whose perception of movie and video content is different from the general public's.

Second, Hedgespeth contends that instead of enforcing a blanket ban on personal computers, defendants could install blocking programs and keystroke monitors on each patient's computer. However, as defendants point out, this is not an easy, obvious alternative because these programs cost a lot of time, money and energy to employ, yet they still might not adequately filter all pornography, gang propaganda or other counter-therapeutic materials.

Finally, Hedgespeth argues that the restrictions at issue should be applied only to those chapter 980 patients for whom they are "necessary." In other words, Hedgespeth contends that the computer restrictions should only apply to patients who are likely to abuse their computer privileges, movies restrictions should only apply to patients who are affected negatively by the movies they view and the video gaming policy should only apply to patients who are prone to anti-social and addictive behavior. Hedgespeth does not suggest how defendants would determine whether such restrictions are "necessary," nor does he respond adequately to defendants' assertion that the rehabilitation efforts of *all* Chapter 980 patients may be negatively affected by the presence of computers, certain movies and video games, and Hedgespeth does not address defendants' concern that a policy allowing some patients greater access to media and electronics than others would create *new* security and rehabilitation concerns. In sum, Hedgespeth has identified no reasonable, easy alternative to the restrictions currently in place.

The Court of Appeals for the Seventh Circuit has noted that "facilities dealing with those who have been involuntarily committed for sexual disorders are 'volatile' environments whose day-to-day operations cannot be managed from on high." *Thielman v. Leean*, 282 F.3d 478, 483

15

(7th Cir. 2002). Courts must presume that the judgment exercised by the appropriate professionals in these facilities is reasonable. *Id.* (citing *Youngberg v. Romeo*, 457 U.S. 307, 312-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function"); *see also Tainter v. Wisconsin Dep't of Health & Family Services*, 2003 WL 23200348, *6 (W.D. Wis. Aug. 5, 2003) (applying *Thielman*).

WRC's and Sand Ridge's restrictions on Hedgespeth's ability to access to computers, the internet, digital storage devices, DVDs, CDs, video games and video game systems are reasonably related to legitimate government interests and therefore, defendants have not violated Hedgespeth's rights under the First Amendment. Accordingly, I will grant defendants' motion for summary judgment.

ORDER

It is ORDERED that:

(1) Plaintiff Raymond Hedgespeth's motion to submit further evidence, dkt. 79, is DENIED.

(2) The motion for summary judgment filed by defendants Byron Bartow and Steven Watters, dkt. 57, is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 27th day of July, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

16